Gregory L. Scott
Attorney at Law
208 Larson Building - P.O. Box 701
Yakima, WA  98907
Phone (509) 574-0991


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
(Honorable Stanley A. Bastian)


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:14-CR-2102-SAB |
| | ) | |
| Plaintiff, | ) | DEFENDANT ABDELLATIF'S SENTENCING |
| | ) | MEMORANDUM |
| vs. | ) | |
| | ) | |
| IBRAHIM ABDELLATIF, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

Defendant, Ibrahim Abellatif, by and through his attorney of record, Gregory L. Scott, hereby submits the following Sentencing Memorandum:

**STATEMENT OF FACTS**

On January 8, 2015, in the Eastern District of Washington, Mr. Abdellatif was arrested and his home and business were searched pursuant to Federal Warrants.  As a result of those searches, approximately 1,400 packages of suspected "spice" was confiscated. According to the information printed on the outside of the packaging,

DEFENDANT ABDELLATIF'S SENTENCING MEMORANDUM - 1

the total aggregate contents of those packages were approximately 5200 grams.  Mr. Abdellatif pleaded guilty to this charge on July 6, 2016.

## **PRESENTENCE REPORT**

Although Mr. Abdellatif recognizes the accuracy of the Presentence Report filed in this case, he respectfully disagrees with the method used to calculate the guidelines.

Paragraph 29 of the Presentence Report quotes a portion of the guidelines that indicates that in the case of controlled substances, the entire weight of a mixture containing a detectible amount should be used.  However, in the case of synthetic THC as applied here by the government, that makes no sense for the reasons noted below.  The Government's logic is that if a substance or mixture contains a detectible amount of synthetic THC then multiply the entire weight of the mixture by 167 to arrive at the equivalent amount of marijuana. See Paragraph 32.

However, the same provision of the guidelines also indicates a multiplier of 167 for organic THC.  Therefore, applying the government's logic to that provision would likewise require that if a substance or mixture contains a detectible amount of organic THC then multiply the entire weight of the mixture by 167 to arrive at the equivalent amount of marijuana.  That would necessarily lead to absurd

results and would render the rest of that provision of the guidelines superfluous. For example, that portion of the guidelines states that if there is an amount of ground or powered marijuana, the applicable ratio is 1:1. Yet we all recognize that ground or powdered marijuana contains a detectible amount of organic THC. Likewise, that provision in the guidelines provides that in the case of cannabis resin or hashish apply a ratio of 1:5. And in the case of hashish oil, apply a ratio of 1:50. In each case, the guidelines clearly recognize a level of purity or distillation as the basis for the differing ratios. Cannabis resin and hashish both contain organic THC. Distinctions are made in this provision of the guidelines based on the purity of those compounds. Hashish oil is more distilled than hashish or cannabis resin, therefore it makes sense to treat it more harshly.

Only within this framework does it make any sense at all to apply a ratio of 1:167 to organic THC. Congress could only have been referring to pure, distilled THC. Likewise, because the identical language is used in the very same section to apply a 1:167 ratio to synthetic THC, it should be presumed that Congress had the same intent.

Other places where Congress has indicated its desire to impose a leveling with respect to sentencing appears in relation to cocaine vs. cocaine base and methamphetamine vs. ice. Both of those situations

recognize Congress' intent to treat sentencing differently based on the level of purity of the offending compound.

**CASE LAW ADDRESSING THE 1:167 RATIO**

In this case, if Mr. Abdellatif had possessed pure XLR-11, then the multiplier of 167 would apply. See, *United States v. Malone*, 828 F.3d 331 (5th Cir. 2016), cert. denied, Nov. 28, 2016. In that case, Mr. Malone and his business partner were manufacturing synthetic THC, then applying it to vegetable matter and selling it under the brand name, "Mr. Miyagi." The focus of the discussion in that case was whether THC was the most closely related controlled substance to the compound in question for purposes of applying the guidelines, and whether the District Court had recognized that it had discretion to depart from the guidelines pursuant to *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). The court in *Malone*, did not address the question presented here, i.e. whether the 1:167 ratio applies to only the amount of the pure compound or whether it applies to the entire quantity of a mixture containing a detectable amount of the compound. Clearly, the defendants in the Malone case were manufacturing the pure synthetic THC and then spraying it on vegetable matter before distribution. In Mr. Abdelatif's case, he was

1    merely acting as the retailer for the already prepared and packaged

2    material.

3         The *Malone* court did state at one point;

4         To the contrary, we agree with the district court that the
         assertion that we *338 ought "compare an isolated chemical
5         with a leafy green substance" seems implausible on its
         face—an uncertainty here not dispelled. Appellants sprayed
6         AM-2201 onto a leafy herb to create Mr. Miyagi. Just as THC
         is the active ingredient in the leafy plant of marijuana,
7         AM-2201 was the active ingredient in Mr. Miyagi. Indeed,
         any contention that the 1400 kilograms of AM-2201 that
8         Appellants admitted to possessing would have been used to
         produce only 1400 kilograms of Mr. Miyagi—a product
9         intended to mimic marijuana—is defied by the record; it
         reflects that the various participants in the conspiracy
10        would have used this quantity of AM-2201 to produce at
         least twenty times as much Mr. Miyagi.

11
         United States v. Malone, 828 F.3d 331, 337-38 (5th Cir.
12        2016), cert. denied sub nom. Green v. United States, 137 S.
         Ct. 526, 196 L. Ed. 2d 408 (2016).
13

14        Although not directly stated, this reasoning certainly seems to

15    support Defendant's logic rather than the government's.  Whatever

16    number of grams this court determines is the correct amount for

17    sentencing purposes, the correct ratio is 1:1, not 1:167.

18        In the case of *United States v. Ramos*, 814 F.3d 910 (8th Cir.

19    2016), cert. denied, U.S. Oct. 3, 2016.  The court addressed the

20    question whether, under the evidence presented in that case, the

21    substances possessed by the defendants were most like pure THC or

22    straight marijuana for purposes of guideline computation.  In

23

24    DEFENDANT ABDELLATIF'S SENTENCING MEMORANDUM - 5

25

addressing that issue, the court held that similar substance question is a factual determination. *Ramos, supra.*

Both sides presented testimony from experts regarding the nature of XLR-11 and THC. The majority of the Ramos court held that, given the evidence presented to the District Court at the sentencing hearing, the appellate court could not find clear error in the District Court's application of the guidelines. However, no similar evidence is before this court. There is no evidence to suggest whether the products at issue here are more like marijuana or more like pure THC.

The dissent in the Ramos case sets out the argument why the appropriate ratio is 1:1 rather than 1:167. Because the standard of review was clear error, the majority held that it could not reverse based solely on the method adopted by the District Court. That opinion does not stand for the proposition that definitively, the correct formula is to apply the 1:167 ratio in all cases involving a mixture or a substance containing a detectable amount of synthetic THC. Rather, it stands for the proposition that this court has discretion to choose, for itself, which ratio should be applied.

## <u>OTHER DISTINGUISHING FACTORS IN THIS CASE</u>

Law enforcement confiscated over 1400 packets of material in this case.  Only five were tested.  Each of those five came from controlled buys over a period of months.  The rest of the packets were seized at the time they were delivered by UPS, during the execution of the search warrant.  Of the packets that were tested, no information regarding purity is contained in the lab reports.  Those reports merely indicate that some amount of a particular controlled substance was detected.  It is interesting to note that the lab reports indicate that four out of the five packets tested contain a controlled substance different from what is alleged in the indictment.

With regard to the remaining packets seized, no information is provided whether those packets all came from the same source as the ones tested, whether they in fact contained the same or similar compounds as the ones tested, or if the contents in fact contain controlled substances at all. It is not even known whether the packages delivered during the search came from one source or multiple sources.

One of the frustrating facts about "spice" is that manufacturers keep changing the chemical compounds to avoid prohibition by the DEA. Nothing on the packaging indicates what chemical compounds are

contained therein.  And as we appear before this court, no one knows what chemical compounds are contained in any of those packets other than the five tested.  And, most importantly, no one knows if the chemical compounds in those packets appeared on the DEA list of prohibited substances at the time they were confiscated.

It is anticipated that the government will suggest that the five packets that were tested are a "representative sample" and therefore, the court is safe to assume that the other 1395 or so packets contained the same material.  However, that is not necessarily true. By analogy, in the agricultural industry we are accustomed to taking a representative sample and relying on it for purposes of quality, the presence or absence of pests and adulterants, etc.  However, no one would suggest that taking a sample from one grower is a representative sample for all agricultural products coming out of the Wenatchee Valley.  The same is true here.  One packet may be a representative sample of others with the same name and from the same lot number of a particular manufacturer.  But such a sample certainly cannot be considered representative of other brands and/or manufacturers. Particularly when we know that the modus operandi of each manufacturer is to constantly change the chemical makeup in an effort to stay ahead of the DEA.  It would therefore be fundamentally unfair for this court to apply the 1:167 ratio as suggested by the government.

## **CORRECT APPLICATION OF THE GUIDELINES**

The Court is left with a couple of options regarding how to apply the relevant provisions of the guidelines. Given the uncertainty surrounding the contents of these packets, Mr. Abdellatif suggests that the court should apply a 1:1 ratio for the amount that we actually have tested and know that some form of controlled substance is indeed present. The total amount actually tested is 13 grams. That would result in a Base Offense Level of 6 and a standard range of 2 to 8 months.

If the court were inclined to apply the ratio of 1:167 then the equivalent amount of marijuana would be 2.17 Kilos. That would result in a Base Offense Level of 8 and a standard range of 6 to 12 months.

## **18 USC § 3553(a) FACTORS**

The nature and circumstances of the offense and the history and characteristics of the defendant:

The nature and circumstances of the offense are well covered in the PSR and above. However, the history and characteristics of the defendant need further attention. Mr. Abdellatif is a person upon whom at least five others depend on for their support. His father passed away this past January. Since that time, Ibrahim has shouldered the responsibility of his father's

DEFENDANT ABDELLATIF'S SENTENCING MEMORANDUM - 9

family and his own.  While Ibrahim does not have children of his own, his father left small children and a young widow.  As the oldest male in his family, it is Ibrahim's responsibility to care for and support his siblings until they marry and his parents as well as his own family.  This is a responsibility that is taken very seriously within the Arab community and Mr. Abdellatif accepts that.  His sister and girlfriend have been at every hearing in support of Ibrahim.  His extended family has also appeared at several other hearings and in support of him at the time of his arrest and detention hearing early on in this case.  The Arab community in the Yakima Valley is very small and Mr. Abdellatif is well regarded within that community, as are his siblings.


   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   Mr. Abdellatif's arrest has already served notice to others in the community regarding the lawfulness of selling the type of products involved here.  At the time of his arrest, it was common to find these and similar products readily available and on display at numerous shops and truck stops throughout Washington State.  Since his arrest and prosecution, those items seem to have practically disappeared from store shelves.  A bright line has been drawn around what once was a

grey area of the law.    A lengthy prison term for this offense would promote disrespect for the rule of law rather than respect for it.

The need for the sentence to afford adequate deterrence to criminal conduct;

As already stated above, the deterrence has already occurred on a widespread basis.

The need for the sentence to protect the public from further crimes of the defendant;

Mr. Abdellitif is not a menace to society and is not a person from whom the public needs protection.    He is a businessman who chose to operate too close to the edge and he has paid a heavy price.    At the time of his arrest and before, many business people were selling this type of product openly in their stores.    He saw others making profits and not facing legal troubles and he engaged in similar business practices.    He will not be selling this type of product ever again.

The need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Mr. Abdellatif is not in need of educational or vocational training.

The kinds of sentences available and the applicable guideline range;

The application of the guidelines to this case has already been addressed above. If the court were to apply the guidelines in the manner suggested by the government in this case, that would result in a guideline range that is so far beyond the bounds of reasonableness that no good could possibly come of it. However, the application of the guidelines in the manner suggested by Mr. Abdellitif does accomplish the goals set forth in the law.

The need to avoid unwarranted sentencing disparities;

This is a relatively unusual case in the sense that there have been very few prosecutions of this nature in this area or around the country. At the time of Mr. Abdellatif's arrest, the owners and operators of One Love were also arrested and indicted for similar offenses. However, the quantity of materials confiscated at those stores dwarfs Mr. Abellatif's inventory by comparison. It is the understanding of the defense, based on conversations with the

government, that no one in that other case has been sentenced to more than 18 months.

Restitution;

As addressed in the Presentence Report, restitution is not an issue in this case.

For all of these reasons, it is respectfully submitted that this court sentence Mr. Abdellatif to probation. He has done well on his pretrial supervision and has not had any issues whatsoever. His conviction and the publicity from his arrest have had a huge impact on him both personally and professionally.

RESPECTFULLY SUBMITTED this 5th day of May, 2017.

s/Gregory L. Scott
WSBA #17433
Attorney for Ibrahim Abdellatif

1    I hereby certify that on May 5, 2017, I electronically filed the

2  foregoing with the Clerk of the Court using the CM/ECF System which

3  will send notification of such filing to the following, and/or I

4  hereby certify that I have mailed by United States Postal Service the

5  document to the following non-CM/ECF participants:

6

7  Benjamin Seal
   Assistant United States Attorney

8  United States Attorneys Office
   402 E. Yakima Ave., Suite 210

9  Yakima, WA 98901

10

11                                        s/Gregory L. Scott
                                          WSBA #17433
12                                        Attorney for Ibrahim Abdellatif
                                          Scott Law Office
13                                        6 S. 2nd Street, Suite 208
                                          Yakima, WA  98901
14                                        Telephone: (509) 574-0991
                                          Fax: (509)574-3177
15                                        Email: gregory@scottlaw.net

16

17

18

19

20

21

22

23

24  DEFENDANT ABDELLATIF'S SENTENCING MEMORANDUM - 14

25